# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**JAN MICHAEL BRAWNER JR.,**                                    **Petitioner**

**vs.**                                    **CIVIL ACTION NO. 2:07-cv-16-MPM**

**CHRISTOPHER B. EPPS, ET AL**,                                    **Respondents**

## MEMORANDUM OPINION

Jan Michael Brawner, Jr., an inmate confined to the Mississippi Department of Corrections, files application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the otherwise final capital murder convictions and four sentences of death imposed on him by the Circuit Court of Tate County, Mississippi. Having considered the alleged circumstances, the cited authorities, and the record in this matter, the Court **DENIES** the application for the reasons set forth below.

### Background

Petitioner married Barbara Craft, the daughter of Carl and Jane Craft, in December 1997 and had a daughter, Candice Paige [hereinafter "Paige"], born on March 5, 1998. Petitioner, Barbara, and Paige periodically lived with the Crafts in Sarah, Mississippi, throughout their marriage. In August 2000, Barbara initiated divorce proceedings against Petitioner on the grounds of Habitual Cruel and Inhuman Treatment. Approximately one month later, Petitioner began dating Jean Fillyaw and moved in with her and her two children at the Rocky Creek Apartments in Southhaven, Mississippi. Petitioner and Barbara were divorced in March 2001, with Barbara retaining custody of Paige. Barbara and Paige lived with her parents in Sarah, Mississippi.

In the early morning hours of April 24, 2001, Petitioner went to the Craft home to borrow money. At the time, Petitioner was driving a rented U-Haul truck, as he had lost his vehicle in the divorce. He sat on the front steps until around 7:00 a.m. but left without speaking to anyone. The next morning, April 25, 2001, Petitioner told Jean Fillyaw he was leaving for work. Instead, he went to Wal-Mart, where he purchased rubber gloves. He then went to the Craft residence, intending to rob the home. He broke into the house and stole a .22 caliber rifle belonging to Carl. Petitioner then visited Carl at work and asked for permission to visit Barbara and Paige. Carl consented.

Petitioner returned to the Craft home later that day. Barbara, Paige, and Jane then arrived a few minutes later. Jane twice asked Petitioner if he had been in the house the previous day. Petitioner denied he had been in the house, but the questions upset him. He went to his vehicle, retrieved the .22 caliber rifle and re-entered the Craft home. Petitioner did not put on the rubber gloves, however, because he did not want to arouse suspicions. He confronted Barbara, telling her that she would not take Paige away from him. Petitioner then shot Jane Craft and Barbara Craft three times each. After shooting Jane and Barbara, Paige raised her arm and said, "Daddy, you hurt me." Though Paige had not been shot, she had been splattered with blood from her mother and grandmother. Petitioner took Paige to the master bedroom and instructed her to watch television. He then paced outside the door for awhile, realized that Paige could identify him, and then returned to the bedroom and shot Paige twice.

Petitioner then waited for Carl to return home. As Carl entered his home, Petitioner shot him three times. Petitioner then put on his gloves and cleaned up evidence of the murders with Windex. He covered Barbara's body with a blue coat and took Jane's wedding rings. He took $

300.00 from Carl's wallet and hid the wallet in a kitchen cabinet behind some spices. Petitioner then took food stamps from Barbara's purse.

Petitioner returned to Jean Fillyaw's apartment and proposed to her with the rings he had stolen from Jane's body. Fillyaw accepted, and Petitioner took her to Ryan's Steakhouse to celebrate. The bodies of Barbara, Paige, and the Crafts were found by David Craft, the brother of Barbara, the morning after the murders. He suspected Petitioner of the crime and told police where Petitioner lived.

Petitioner was arrested on April 26, 2001, at Fillyaw's apartment. Pursuant to a search conducted by consent, police found the .22 rifle in Fillyaw's vehicle and latex gloves in the U-Haul. Fillyaw also informed police that Petitioner had given her a diamond wedding set the previous night. Petitioner was taken into custody and ultimately gave at least two statements admitting the shootings. He also stated that he knew the murders were wrong, but he thought he had read enough about crimes "to get away with it."

Attorney David Walker was appointed as counsel for Petitioner at his arraignment on July 18, 2001. On October 24, 2001, Tommy Defer, who worked for Mr. Walker, was appointed by the trial court as a law clerk to help Mr. Walker prepare the case for trial. Thereafter, Mr. Defer successfully completed the Mississippi Bar Examination and was admitted to the practice of law on the first day of Petitioner's trial, April 8, 2002. Mr. Defer was also appointed as co-counsel on that date.

Records from counsel's case file indicate that Mr. Defer met with Petitioner on September 8, 2001 to discuss the possibility of a plea bargain. The case file memorandum completed by Mr. Defer indicates that Petitioner stated he would rather receive the death penalty

than spend the rest of his life in prison, and that he "did not change his mind" after discussing the issue in detail. Letters between Petitioner and his trial counsel confirm that Petitioner did not want to plead guilty in exchange for a life sentence. On November 19, 2001, Mr. Walker wrote to Petitioner inquiring whether, in light of the fact that Petitioner did not want to spend his life in prison, Petitioner wanted Mr. Walker to contest guilt and/or the death penalty in the event he was found guilty. An intent to present an insanity defense was subsequently filed with the circuit court on November 26, 2001. Petitioner did, in fact, assert an insanity defense at trial, though he was adjudged competent and sane prior to trial by staff at the Mississippi State Hospital. Petitioner's own expert, Dr. Marsha Little-Hendren, also determined that Petitioner was competent to stand trial and sane at the time of the murders.

The jury found Petitioner guilty of capital murder while engaged in the crime of robbery of Carl and Jane Craft and Barbara Brawner. He was found guilty of the capital murder of Paige Brawner while engaged in the commission of the crime of felonious abuse and/or battery of a child. Following a sentencing hearing, the jury returned a sentence of death on all four counts on April 11, 2002. As to each count, the jury found that (1) Petitioner committed the capital offense while under a sentence of imprisonment; and (2) the capital offense was committed for the purpose of avoiding or preventing a lawful arrest. On Count I, involving the murder of Paige, the jury additionally found that the capital offense was committed while Petitioner was engaged in the commission of felonious abuse and/or battery of a child. On Counts II, III, and IV, the jury found that Petitioner committed the capital offense while engaged in the commission of a robbery.

An automatic appeal ensued, and trial counsel also served as appellate counsel. The trial

record as designated on appeal did not contain a transcript of all of the trial proceedings, including voir dire proceedings and opening and closing statements at both phases of Petitioner's trial. On direct appeal, the Mississippi Supreme Court affirmed Petitioner's convictions and sentences of death. *Brawner v. State*, 872 So.2d 1 (Miss. 2004) ("*Brawner I*"). Though Petitioner did not file a petition for writ of certiorari following direct appeal, he did seek post-conviction relief. By order dated May 27, 2005, the Mississippi Supreme Court granted Petitioner's motion to supplement his petition as to the previously omitted portions of the trial transcript. The entire record was filed with the Mississippi Supreme Court on November 14, 2005, but Petitioner did not file a supplemental petition to address claims pertaining to the previously omitted portions of the transcript. The Mississippi Supreme Court subsequently denied relief on all claims asserted in the post-conviction petition. *See Brawner v. State*, 947 So.2d 254 (Miss. 2006) ("*Brawner II*"). Thereafter, Petitioner applied for a petition of writ of habeas corpus in this Court.

## Applicable Standard

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996). Pursuant to the AEDPA's scope of review, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See Schriro v. Landrigan*, 550 U.S.

465, 473 (2007); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); and 28 U.S.C. § 2254(d)(1) & (2).

The factual findings of the State court are presumed correct, and Petitioner bears the burden of

rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) have

been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694 (2002);

*Penry v. Johnson*, 532 U.S. 782, 792 (2001). Federal habeas relief may be granted under the

"contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the

Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on

a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" clause, a federal court may grant relief where the State

court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08;

*see also Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an

objective inquiry that does not turn on whether the decision is merely incorrect. *See Schriro*, 550

U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state

court's determination was incorrect but whether that determination was unreasonable - a

substantially higher threshold."); *Williams,* 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309,

313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively

unreasonable).

A petitioner must exhaust his remedies in State court prior to seeking federal habeas

relief. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); *Wilder v. Cockrell*, 274 F.3d

255, 259 (5th Cir. 2001); 28 U.S.C. §2254(b)(1). A petitioner has exhausted his claim when he

has fairly presented the claim for which he seeks relief to the highest court of the State. *See*

*Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004). The federal claims presented for habeas relief must be the substantial equivalent of those presented to the State court in order to satisfy the requirement of fair presentation. *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). A claim is not exhausted for purposes of federal habeas review if a petitioner presents the federal court with different legal theories or factual claims from those pursued in State court. *See Wilder*, 274 F.3d at 259 ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus relief. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995). Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds. *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds.");

*Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).  In order to receive federal habeas review of procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  In some instances, counsel's ineffectiveness may suffice to establish "cause" for failure to exhaust a claim on appeal, but the claim of ineffectiveness must itself be brought as an independent claim and exhausted in state court.  *See Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).  Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Carrier*, 477 U.S. at 494 (internal quotations omitted).  If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime.  *See House v. Bell*, 547 U.S. 518, 537-38 (2006). An allegation of actual innocence requires that a petitioner support his claim "with new, reliable evidence that was not presented at trial and show that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  In terms of the sentencing phase, "miscarriage of justice" also means that, but for constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty under the applicable state law.  *Sawyer v. Whitley*, 505 U.S. 335, 336 (1992).

Where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5th Cir. 2005) (alternate holding on merits by state court did not preclude imposition of bar on federal habeas review for petitioner's failure to contemporaneously object on federal constitutional grounds in state court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

Finally, the Court notes that the AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on the petitioner, and it limits the circumstances in which an evidentiary hearing may be granted for those petitioners who fail to diligently seek to establish the factual bases for their claims in state court. *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2). Even where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision to grant an evidentiary hearing is discretionary. *See, e.g., Clark,* 202 F.3d at 765-66. In order to be entitled to an evidentiary hearing in federal court, a petitioner must demonstrate that he was denied a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would warrant relief. *Id.* at 766 (citations omitted).

Petitioner initially alleged thirteen separate grounds for relief in his amended petition, but

he has since withdrawn two of those grounds.  (*See* Pet. Memo).  Though the Court has

individually considered all of the claims, it has renumbered and consolidated, where appropriate,

the remaining claims.

## I.  Ineffective Assistance of Counsel

A criminal defendant has the constitutional right to effective counsel.  U.S. Const. amend.

VI, XIV.  In order to establish that he was denied effective counsel, Petitioner must show that his

attorney rendered constitutionally deficient performance that actually prejudiced him.  *Strickland*

*v. Washington*, 466 U.S. 668, 687 (1984).  This requires Petitioner to show (1) that counsel's

performance fell below an objective standard of reasonableness in light of the prevailing

professional norms, and (2) that, but for counsel's deficient performance, the result of the

proceeding would have been different.  *See id.* at 688, 695.  Judicial scrutiny of counsel's

performance is highly deferential, and there is a strong presumption that counsel's conduct fell

within the range of reasonable professional assistance or sound trial strategy.  *See id.* at 668, 688-

89.  Both the "deficiency" and the "prejudice" prongs must be satisfied, or it cannot be said that

the adversarial process was so lacking that it rendered an unreliable result, thereby denying

Petitioner a fair trial.  *See id.* at 687.[1]

### A.  Counsel's failure to investigate and present mitigating evidence

Petitioner was represented at trial by court-appointed attorneys David L. Walker and

---

[1]  The Court notes that Petitioner has requested, in a footnote in his reply memorandum, the opportunity to take the depositions of his trial attorneys and the psychologist authorized by the trial court to assist Petitioner at trial.  (*See* Pet. Reply 1, n.1).  He alternatively requests that the Court hold an evidentiary hearing on his claims.  (Pet. Reply 1 and n.1).  Petitioner has not demonstrated an entitlement to discovery or an evidentiary hearing on any of the claims raised in the petition.

Tommy Defer. At the time Mr. Walker was appointed to represent Petitioner, Mr. Defer was Mr. Walker's law clerk. (*See* Pet. Memo, Ex. 4). Mr. Defer was sworn into the practice of law on the day Petitioner's capital murder trial commenced and was also appointed co-counsel at the same time. (*See* Supp. vol. 1 of 1, 16).[2] Petitioner maintains that Mr. Defer, who had failed the bar examination on at least one occasion, handled the client contact, investigation, expert witness development, and preparation for the mitigation phase of trial. Petitioner maintains that Mr. Walker made a "wholesale delegation" of his responsibilities to Mr. Defer, such that Petitioner was denied the skill and knowledge necessary to present a defense. Petitioner argues that a law student is not "counsel," and that he has met the standard for presuming prejudice under *United States v. Cronic*, 466 U.S. 648, 655-57 (1984). Petitioner argues that law students are per se incapable of fulfilling the duties of counsel under the American Bar Association Guidelines. (Pet. Memo 41-42; citing Guideline 4.1(A)(1); 5.1(B)(1)(a)).

Petitioner argues that a wealth of available mitigation evidence went unused at trial due to Mr. Walker's violation of Petitioner's trust and his failure to form a meaningful relationship with Petitioner. Petitioner notes that Mr. Defer's itemized statement shows he spent 92.5 hours on the case, and that the statement includes no hours for the investigation of mitigation evidence. (*See* Pet. Memo, Ex 5). Petitioner maintains that only (1) his mother; (2) his sister; and (3) Dr.

---

[2] The trial record in this case is comprised of seven consecutively numbered volumes and two supplemental volumes. The first two of the consecutively numbered volumes are State court papers, hereinafter "SCP." Volumes three through seven are hereinafter referenced as "Trial Tr. vol. __, ___." One supplemental volume contains the portion of the trial transcript not designated on direct appeal. That supplemental volume will be designated in this opinion as "Supp. vol. 1 of 1, ___." The remaining supplemental volume contains two juror questionnaires. The record also contains two bound volumes from Petitioner's direct appeal and post-conviction proceedings.

Marsha Little-Hendren were prepared to testify during the mitigation phase, though other family members were willing to testify but were not contacted by defense counsel. (*See* PCR Ex. 7, 15). Petitioner alleges that his family members only learned that his trial had commenced when they received subpoenas to appear on the second day of trial. (*See* PCR Ex. 8). Petitioner further argues that he never intended to waive all mitigation, and that trial counsel's delegation of important decisions failed to guide and inform Petitioner's decision making. Petitioner contends that Mr. Walker informed Petitioner that his mother would have nothing to offer if she testified at the guilt phase, unaware of the fact that counsel could have presented a mitigation theory through witnesses at the guilt phase. Petitioner argues that "begging for life" and providing a family history are different approaches, and since counsel did none of the legwork necessary to prepare a case in mitigation, counsel could only characterize the case in mitigation as "begging."

Petitioner maintains that counsel's failure to investigate led to a wealth of information going undiscovered, and that the failure of Mr. Walker to develop a relationship of trust with his client was deficient and prejudicial. He contends that available mitigation evidence included (1) a prior diagnosis of depression and Post Traumatic Stress Disorder ("PTSD"); (2) that he suffers from a learning disorder; (3) that his family moved frequently due to their financial woes brought on by drug and alcohol abuse; (4) that he was exposed to drug and alcohol abuse; (5) that he and his sister were exposed to physical abuse; (6) that as a child he received beatings to keep him silent when he witnessed his father repeatedly rape his younger sister[3]; (7) that he was admitted to Parkwood Hospital at the age of fourteen for huffing gasoline and was diagnosed with

---

[3] Petitioner's father was sentenced to a term of imprisonment of twenty years, five suspended, for the sexual battery of Petitioner's sister. Petitioner's father ultimately served seven and one-half years at Parchman. (*See* Amend. Pet. 22)

Polysubstance Abuse; (8) that his school records reflect a marked drop in performance during the height of abuse in the home; and (9) and that he ultimately dropped out of school in the ninth grade and failed to obtain his GED.

Petitioner also argues that the circumstances of his marriage and divorce from Barbara would have provided mitigating evidence at his trial. In 2000, Petitioner alleges that he was in three car accidents, one of which left his brother with brain damage and partial paralysis. Petitioner and Barbara were also injured in that accident, though Petitioner contends that he refused medical treatment despite having sustained head injuries. Petitioner maintains that he began to experience severe depression after the car accident, and that his depression worsened when Barbara left him. Petitioner alleges that Barbara obtained a divorce without Petitioner present, and that she received full custody of Paige, child support, and all of the parties' personal property. Soon thereafter, Petitioner maintains he was fired from his job and was unable to work. Petitioner contends that financial strain, his divorce, and the loss of his child pushed him to the breaking point, and that he was a mental and emotional wreck at the time of the murders.

Petitioner argues that the unused mitigation evidence is not cumulative of what counsel was prepared to present. He contends that the evidence of his violent, traumatic childhood offered through expert testimony could have explained to the jury his PTSD diagnosis and its effects. Trial counsel failed, however, to have Dr. Little-Hendren testify or otherwise develop mitigation evidence. Petitioner maintains that counsel's duty is present even when the client is uncooperative. He argues that Mr. Walker delegated responsibility to a law clerk, failed to meet with Petitioner in a confidential setting, and raised strategic decisions via correspondence. (*See* Pet. Memo, Ex. 16, 17).

The Mississippi Supreme Court considered Petitioner's claim that trial counsel rendered ineffective assistance in failing to present mitigating evidence. *See Brawner II*, 947 So.2d at 263. Petitioner's mother, his sister, and a psychiatrist were all willing to testify at Petitioner's trial, but the court determined that it was Petitioner's choice not to have their testimony presented to the jury. *See id.* The Mississippi Supreme Court found that Mississippi law does not require an attorney to go against the wishes of the client, as long as those decisions are informed and voluntarily made. *See id.* The court noted that trial counsel had prepared a case in mitigation, that trial counsel made recommendations, that the prosecutor made recommendations, and that Petitioner was fully advised "of the gravity of his choice" in waiving the presentation of mitigating evidence. *See id.*

Petitioner argues that the Mississippi Supreme Court's resolution of his claim is unreasonable, as counsel did not investigate all avenues of mitigation and then advise his client. Petitioner notes that defense counsel did not state on the record the theory under which they intended to present a doctor to testify in Petitioner's defense, and he argues the fact that Kenneth Fox, Petitioner's former probation officer, testified is evidence that Petitioner did not wish to waive all mitigation.

David L. Walker was appointed to represent Petitioner at Petitioner's arraignment on July 18, 2001. (*See* Pet. Memo, Ex. 1). Tommy Defer, who worked for Mr. Walker, was appointed as "law clerk" on October 24, 2001. (Pet. Memo, Ex. 5). Mr. Defer was appointed as co-counsel after he was sworn into the practice of law on the day Petitioner's trial began. (Supp. vol. 1 of 1, 16). In a memorandum memorializing Mr. Defer's two hour interview with Petitioner on August

18, 2001, Mr. Defer noted that he discussed the possibility of a plea deal with Petitioner. (*See* Pet. Memo, Ex. 10). Mr. Defer stated that Petitioner refused to plead guilty in exchange for the death penalty being removed as a possible sentence, as Petitioner stated he would rather suffer death than spend the rest of his life in prison. (*See id.*). On the following day, Mr. Defer wrote a letter to Petitioner confirming that Petitioner did not want Mr. Walker to work out a plea deal with the State and asked Petitioner to inform him if he had changed his mind. (*See id.*). On September 20, 2001, Petitioner responded, stating that he did not want to plead guilty in exchange for a sentence of life. (Pet. Memo, Ex. 11). On November 15, 2001, Petitioner wrote to Mr. Walker, stating that he was "guilty of a crime" and needed "to be put to Death!". (Pet. Memo, Ex. 12). Mr. Walker subsequently wrote Petitioner and asked for Petitioner to advise him, in writing, of whether he wished to contest his guilt and whether he wished to contest the death penalty in the event he was found guilty of any of the murder counts. (Pet. Memo, Ex. 13).

On September 18, 2001, Mr. Walker filed a motion asking the court to order a mental evaluation of Petitioner. (Pet. Memo, Ex. 6). By November 2001, Mr. Walker and Petitioner had agreed that they would pursue an insanity defense at trial. (*See id*.). On January 18, 2002, the court entered an order granting Petitioner's motion for a mental evaluation and appointing Dr. Marsha Little-Hendren to evaluate Petitioner. (Pet. Memo, Ex. 7). Subsequent memos establish that Mr. Defer met with Dr. Little-Hendren, advised her that the defense was pursuing an insanity defense, and provided her with Petitioner's records from Parkwood. (*See* Pet. Memo, Ex. 6). Dr. Little-Hendren conducted an evaluation of Petitioner over the course of two visits with him in March 2002. (See Pet. Memo, Ex. 8). After the second meeting with Petitioner, Dr. Little-

Hendren informed Mr. Defer that her opinion was that Petitioner was not insane or incompetent at the time of the murders. (*See id.*). Dr. Little-Hendren advised counsel that she could only offer help for Petitioner in mitigation at the sentencing phase of trial. (*See id.*). Dr. Little-Hendren wrote a brief report to Mr. Walker and Mr. Defer on April 5, 2002, in which she opined that Petitioner was suffering from a long-standing clinical depression that began in his childhood, and that he also likely had Post-Traumatic Stress Disorder. (*See id.*).

At the close of the State's proof at trial, counsel for Petitioner moved for a directed verdict. (*See* Trial Tr. vol. 5, 379-81). The trial court denied the motion, and counsel for Petitioner inquired on the record whether Petitioner wished to testify. (*See id.* at 383). Petitioner stated that he wished to testify on his "own free will." (*Id.*). Mr. Walker also asked:

> Mr. Brawner, do you wish for me to try to get you "life" or "life without parole," if you are, in fact, found guilty of any of these counts by the jury? In other words, it's what the lawyers call "put on a mitigation case," call your mother as a witness to tell about your background, call Dr. Marsha Little-Hendren to tell what she found. How do you wish me to proceed, is what I need to know from you?
> THE DEFENDANT: As far as life, I don't feel that I deserve to live.
> MR. WALKER: You're the boss. You tell me how you want me to do your case now. Do you want me to call people and beg for your life and put on a mitigation case, your mom, your sister, Dr. Little-Hendren, or not? I don't mean to be ugly to you, but things have got to roll rapidly. Your mom's here, your sister's here, Dr. Hendren is on telephone standby. And I intend to call you and maybe one or two short witnesses. Then I need to know, do I need to line these other folks up or do I need to disregard it. Like I say, I respect your opinion and I'll do what you tell me to do but I'm at the point where I have to know from a logistic tactical standpoint.
> THE DEFENDANT: As far as - - I believe I understood earlier that we had agreed that my mom would testify.
> MR. WALKER: So, if you're found guilty, you want your mom to testify? But she really doesn't have anything to add, I don't think, at this stage whether you're guilty or not guilty.
> THE DEFENDANT: If I'm guilty, no.

(*See* Trial Tr. vol. 5, 384-85).

During the same exchange, Mr. Walker states:

> MR. WALKER: And I told you - - you know, you kind of put me in a quandary
> here, I'm being asked to do something that I haven't done in ten capital murder
> trials, but I will respect your opinion, but that's the quandary you've put me in,
> and I respect it.
> MR. CHAMPION: David, for the record, is it your recommendation that he put on
> mitigating evidence in the guilt - - in the sentencing phase if we reach that point?
> MR. WALKER: Based upon 18 years as a criminal defense lawyer, based upon
> ten capital murder trials, the answer is "yes," but I qualify that by saying I will
> honor his order and his instructions.
> MR. CHAMPION: I understand. But based upon your experiences, you believe
> that he should put on mitigating circumstances to at least warrant the possibility of
> the jury finding life without or life in prison; is that correct?
> MR. WALKER: That's correct. I'm prepared to do so. You know, we have
> witnesses subpoenaed, we have the doctor on standby, his doctor. But I clearly
> understand that his wishes override any opinion that I may have.
> MR. CHAMPION: And you, as his attorney, do have, for the record, witnesses
> subpoenaed and ready to put on the stand in mitigation should we reach that
> stage?
> MR. WALKER: That is true with one exception. I subpoenaed every possible
> mitigation witness we discussed except a lady named Janet Cleveland. I called
> her prior to the trial and she said, quote she really knew nothing about nothing
> except she knew a former girlfriend. She said she couldn't help him. She would
> be negative toward him. And Mr. Brawner and I agreed not to have a subpoena
> served on her. But other than that all the subpoenas have been issued except for
> Dr. Hendren and she's on a telephone standby.
> MR. CHAMPION: As a matter of fact, in her report provided to us by you, she
> indicated that she could in fact help you in mitigation.
> MR. WALKER: Yes, sir, she did.
> MR. CHAMPION: And it's Mr. Brawner's wish that, based on your
> recommendation to put on her on stand, but he's telling the Court right now he
> does not wish to put her on the stand or any other mitigating witnesses that you've
> subpoenaed?
> MR. WALKER: That's correct. I'm - - the mitigation case is prepared if I'm
> instructed to go forward with it.

(*Id.* at 386-87).

Following a private conference between Mr. Walker and Petitioner, an on-the-record

17

discussion occurred where Mr. Walker asked Petitioner questions to ensure Petitioner understood

the bifurcated trial process.  (*See id.* at 389).  The following exchange was had:

> MR. WALKER:  Mr. Brawner, a capital murder trial in Mississippi has two parts
> or phases.  One is where the jury finds the man or lady guilty or not guilty.  Do
> you understand that now?
> THE DEFENDANT: Yes, sir.
> MR. WALKER: And the other part is, if one is found guilty then the jury decides
> "life, life without parole, or death."  One of those three options would be the
> sentence.
> THE DEFENDANT: Yes, sir.
> MR. WALKER: For some reason you - - in your mind, somehow you thought
> your mom could testify at the guilt phase or part of the trial even though she
> knows nothing about the facts, in other words, you didn't go to her house after
> you left the Craft house and didn't take her out to Ryan's like you did your
> girlfriend, so your mom really knows nothing about the facts: is that right?
> THE DEFENDANT: That's correct.
> MR. WALKER: So based upon that misunderstanding, you don't wish to call
> your mother as a witness because she knows nothing about the facts that I could
> bring out and your desire is that she not testify before the jury and beg for you to
> get life or life without parole?
> THE DEFENDANT: That's right.

(*Id*. at 389).

During the jury instruction conference, the trial judge advised Mr. Walker that he knew

how difficult a client Petitioner was, and that he'd "never seen a lawyer put in a worse situation"

than Mr. Walker.  (*Id.* at 424).  The trial judge stated that he would advise Mr. Walker to argue

for life, even against Petitioner's wishes.  (*See id.* at 425).  Mr. Walker responded that he had a

strategy.  (*See id*.).

The trial court later noted that instructions as to mitigating factors were given over

defense counsel's objection.  (*See* Trial Tr. vol. 6, 453-54).  Mr. Walker stated he would like to

get Petitioner's wishes on the record and inform him that this represented his last opportunity to

have Mr. Walker present a case in mitigation.  (*See id.* at 455).  Petitioner was brought into the

judge's chambers, and the following transpired:

> MR. WALKER: Mr. Brawner, when the jury gets back from lunch Mr. Champion
> and/or Mrs. Brewer are going to ask the jury to impose the death penalty upon
> you.  You have consistently throughout my representation of you, and Mr. Defer,
> instructed me not to present what's called a mitigation case.  In lay terms that
> means ask for life or life without parole.  Is that still your desire that I not ask for
> life or life without parole at the sentencing phase of this trial?
> THE DEFENDANT: Yes, it is.
> MR. WALKER: To be quite frank with you, Mr. Brawner, I'm not going to ask
> you again.  This is the last time.  When I come back from lunch I'm going to do
> my argument and sit down, and I'm not going to ask you again.  Is that all right
> with you?
> THE DEFENDANT: Yes, sir.
> Mr. CHAMPION: A couple of questions, Your Honor. . . . Mr. Brawner, you
> understand what has happened at this point; is that correct?
> A.       Yes, sir.
>
>                     * * *
>
> Q.  Do you understand the ramifications of not putting on any mitigation proof?
> A.  I don't know the word "ramifications."
> Q.  Ramifications means what may happen to you if you do not put on any proof
> of mitigation.  In other words, without something that the jury can hear from the
> witness stand, they in all likelihood would have more than ample opportunity to
> sentence you to death by lethal injection.  Do you understand that?
> A.  Yes, sir.
> Q.  And you're fully aware of what's going on and what's happened to you, and
> this is a free and voluntary decision that you're making against your lawyer's
> advice?
> A.  It is.

(Trial Tr. vol. 6, 455-57).

The trial court found Petitioner competent to make the decision to waive the presentation

of a case in mitigation and noted that Petitioner had  "consistently instructed his layer to take this

position."  (*Id.* at 457).  Mr. Walker stated that he had three witnesses ready to testify "out of a

matter of precaution."  (*Id.* at 458).

A Sixth Amendment violation may be found without demonstrating prejudice when the existing circumstances "are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (1984). One of these is when there is a "complete denial of counsel," in that counsel is "totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 and n.25. Petitioner has argued that he was denied counsel. The Court does not know how many times Petitioner and Mr. Walker met to discuss strategy, but it is apparent from a reading of the record that Mr. Walker did not make, as Petitioner suggests, a "wholesale delegation" of this case to Mr. Defer. Mr. Walker filed motions, argued motions, directed and cross-examined witnesses, delivered opening and closing statements, and objected throughout trial. Petitioner had court-appointed counsel who was assisted by a law clerk prior to trial, and Petitioner was not actually or constructively denied counsel. *Cronic* is inapplicable to this case.

Moreover, a defendant who has expressly instructed his attorney not to present mitigating evidence during the sentencing portion of his capital murder trial cannot satisfy the prejudice prong of the *Strickland* test. *See Schriro v. Landrigan*, 550 U.S. 465, 475 (2007). The evidence in the record shows Petitioner was competent to assist in his own defense, and he was repeatedly questioned by the trial court to ensure that he understood that he was waiving his right to present evidence. Unlike the facts in *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), where the defendant refused to cooperate with the development of a case in mitigation but did not state that he did not want mitigating evidence presented, Petitioner did not want any evidence presented that would suggest that he did not deserve sentences of death.

Petitioner has not demonstrated that counsel failed to investigate potentially meritorious mitigating evidence, as counsel made steps to prepare a case in mitigation. They retained the services of Dr. Little-Hendren and provided her with Petitioner's Parkwood records. Mr. Walker had information concerning Petitioner's background of abuse and neglect from the letter of Petitioner's mother, who was prepared to testify at the sentencing phase. The record demonstrates that Petitioner, from the beginning of his case, stated he did not want to live the remainder of his life in prison and would prefer the death penalty. While one witness, a probation officer, testified at the sentencing phase of trial, he did not testify to any particular aspects of Petitioner's background or character. Petitioner was adamant that no proof be presented that he deserved a sentence less than death. Despite that information, Mr. Walker prepared witnesses to testify in mitigation as a precaution. The wealth of the available mitigating evidence is irrelevant in light of Petitioner's informed wishes, and Petitioner has not demonstrated that the Mississippi Supreme Court's resolution of this claim was unreasonable. This claim shall be dismissed.

## B. Failure to develop a meaningful relationship

Petitioner contends that his relationship with Mr. Walker was permanently damaged after Mr. Walker provided the media with confidential information concerning the sexual abuse of Petitioner's sister without the family's consent. Further, Petitioner maintains that counsel failed to develop a meaningful relationship with him, thereby prejudicing his case. For example, he maintains that counsel acquiesced to Petitioner's decision regarding what evidence to present in mitigation without understanding that Petitioner did not want all mitigating evidence waived. He

maintains that counsel could have introduced certified copies of records documenting the sexual abuse of his sister and his treatment records for his PTSD. Petitioner argues that defense counsel did not know what proof he wanted to put on because counsel failed to develop a relationship with him. He also maintains that Mr. Walker conducted no investigation into the case prior to sending his clerk to approach Petitioner concerning a possible settlement, and that a law clerk should not have been sent to advise him about a matter of such paramount importance.

Respondents argue that Petitioner has never presented this claim to the State courts and that it is barred. In his post-conviction proceedings, Petitioner presented as a claim of error that counsel was ineffective in investigating Petitioner's family background and in failing to present mitigating evidence. (*See* PCR Pet., Ground VIII and Ground IV, 42-52). He did not argue that counsel failed to develop a meaningful relationship with him that would have led to mitigating evidence being presented at trial. Petitioner now argues a new legal theory that was not fairly presented to the State court. Such claim is now barred. *See Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (exhaustion requirement "is not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition"). Petitioner has demonstrated no cause for the default and actual prejudice as a result, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

However, procedural bar notwithstanding, this claim does not warrant relief. Petitioner's mother wrote a letter to Mr. Walker explaining the details of Petitioner's life. The letter included details of the sexual abuse he and his sister suffered as children. (*See* Pet. Memo, Ex. 14; PCR Ex. 7 at ¶ 47). In the affidavit she filed during the course of Petitioner's State post-conviction

proceedings, Petitioner's mother alleged that Mr. Walker gave the letter to the media without the

family's consent. (PCR Ex. 7 at ¶ 47). Although the letter to Mr. Walker is undated, it was

presumably given to Mr. Walker prior to November 15, 2001, as a letter from Petitioner to Mr.

Walker on that date referenced Petitioner's anger that Mr. Walker had done something improper

with the information. (*See* Pet. Memo, Ex. 12). In his November 19, 2001, letter in response,

Mr. Walker stated that *The Commercial Appeal* had obtained information about Petitioner's

background from court records in DeSoto County, Mississippi. (Pet. Memo, Ex. 13).[4] The Court

notes that in a subsequent letter to Mr. Walker, dated December 19, 2001, Petitioner advised Mr.

Walker of his desire to testify at trial and provided names of witnesses who could testify on his

behalf. (*See* Pet. Memo, Ex. 17). Petitioner closed the letter by thanking Mr. Walker. (*See id.*).

It is clear Petitioner was assisting in his defense, even after he believed Mr. Walker leaked

information to the media. There is no evidence that their relationship was impaired. Moreover,

the law grants defendants no right to a "meaningful relationship" with trial counsel. *See Morris*

*v. Slappy*, 461 U.S. 1, 13-14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees

a 'meaningful relationship' between an accused and his counsel."); *see also McCrae v.*

*Blackburn*, 793 F.2d 684, 688 (5th Cir. 1986) (lack of communication between counsel and

appellant did not constitute ineffective assistance absent showing that lack of communication

resulted in prejudice to appellant); *United States v. Keys*, 67 F.3d 801 (9th Cir. 1995) ("A

_____

[4] The Court notes that attached as an exhibit to the State post-conviction petition are several newspaper articles about Petitioner's crime. (*See, e.g.*, PCR, Ex. 1). One of these, an article from *The Commercial Appeal* dated May 4, 2001, states that "[w]hat little can be discovered about Brawner comes from the court files in DeSoto and Tate counties." (*See id.*). The article goes on to recount the circumstances surrounding the conviction of sexual abuse against Petitioner's father. (*See id.*).

defendant's right to the effective assistance of counsel does not entitle him to a friend."); *Jones v. Walker*, 496 F.3d 1216 (11th Cir. 2007) (there is no right to a meaningful relationship under Sixth Amendment). This claim is barred. Alternatively, Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

## C. Failure to request a change of venue

At the time of trial, Petitioner stood accused of killing his ex-wife, his child, and his former in-laws in a small community with Memphis media outlets. Petitioner contends that the community was saturated with prejudicial publicity through the print and air media, and that each local news outlet repeatedly presented stories and footage with inflammatory content. Petitioner argues that despite the inflammatory content run by each news outlet, trial counsel failed to file a motion for change of venue. Petitioner maintains that this failure constitutes ineffective assistance of counsel.

Petitioner presented this claim to the Mississippi Supreme Court on post-conviction review, and it held that as defense counsel has no duty to attempt to transfer venue, the issue is one of trial strategy. *Brawner II*, 947 So.2d at 261-62. The court also determined that Petitioner had not proven prejudice, even if a deficient performance were assumed. It found that "[g]iven the quantum of evidence presented against him, including his own confession, it is unlikely that a jury in any other county would have reached another verdict." *See id.* at 262. Petitioner maintains that this Court should review his claim de novo, as the Mississippi Supreme Court applied an improper test. He maintains that the test is whether "a jury not impacted by prejudicial media coverage" would have been obtained had counsel acted appropriately.

The Court determines Petitioner has not demonstrated that the decision of the State court was objectively unreasonable. Mississippi has long held whether to transfer venue is a strategic decision. *See*, *e.g.*, *Faraga v. State*, 514 So.2d 295, 307 (Miss. 1987). Petitioner has not demonstrated that counsel's failure to seek a change of venue is outside the realm of reasonable professional assistance. Moreover, a change of venue is required under circumstances that make a fair trial improbable in the county where the crime was committed. *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). To establish that counsel was ineffective in failing to request a change of venue, Petitioner must demonstrate that the outcome would have been different had counsel not been deficient. *See Strickland*, 466 U.S. at 695. Prejudice is presumed as a result of pretrial publicity only where a defendant can show evidence that the community was saturated with prejudicial publicity to the point that receiving a fair trial by an impartial jury was virtually impossible. See, *e.g.*, *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980).

Petitioner has not shown that his trial was conducted in an inflammatory community atmosphere. During voir dire, the trial court asked the prospective jurors whether anything they had heard or seen about the case had made such an impression on them that they felt they could not lay aside that opinion. (Supp. vol. 1 of 1, 25). Four prospective jurors responded, and none of them were seated on the jury. (*See* Supp. vol. 1 of 1, 23-29). The record contains copies of some of the newspaper and broadcast media attention given to Petitioner's case, with the dates ranging from April to May of 2001. (*See* PCR Ex. 1). Petitioner's trial did not occur until April of 2002. Moreover, the trial judge specifically noted in his report to the Mississippi Supreme Court that "[t]here was considerable publicity at the time of the offense, but not immediately

prior to trial." (Trial Tr. vol. 7). In that report, he also indicated that the there was no evidence of "passion, prejudice, or other arbitrary factor[s]" that might have influenced the jury. (*Id.*).

Petitioner has not alleged that any juror who heard his case was not impartial, nor has he produced evidence to show that a change of venue would have been granted if it had been presented. Moreover, this Court finds Petitioner has not demonstrated that the Mississippi Supreme Court was objectively unreasonable in reaching its decision that the "quantum of evidence" against Petitioner made it unlikely that a different verdict would have been reached with another jury. Petitioner cannot demonstrate by a reasonable probability that had counsel moved for a change of venue, it would have been granted, or that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

## D. "Stacking" of underlying felony and aggravator

At Petitioner's trial, robbery was the underlying felony for three of the capital murder charges and was also used as an aggravating factor at the sentencing phase of trial. Petitioner argues that this duplicative use fails to narrow the class of offenders eligible for the death penalty, fails to guide the sentencer's discretion, and skews the weighing process of mitigation. Petitioner argues that the constitutionally mandated "narrowing" of death sentences did not occur in his trial. *See, e.g., Furman v. Georgia*, 408 U.S. 238 (1972) (holding that states are required to limit the class of murderers to which the death penalty may be applied). Petitioner contends that the Mississippi Legislature has not sufficiently narrowed the death-eligible class of offenders in its capital murder definition, as the maximum penalty for capital murder without a sentencing

hearing is life imprisonment. If a sentencing hearing is held and the jury fails to find at least one aggravating factor and a *mens rea* element, Petitioner maintains, the statutory maximum is life imprisonment. Therefore, he argues, aggravating circumstances are discrete elements that elevate the punishment and are the equivalent of a greater crime. Petitioner contends that an aggravating factor that duplicates an element of the non-aggravated offense does not further narrow the class of offenders and does not render the defendant death-eligible. In other words, Petitioner maintains that a defendant cannot legally be sentenced to death without a jury finding of an aggravating circumstance that is distinct from the elements comprising the statutory crime. As murder in the course of a robbery "necessarily subsumes" the robbery aggravator, Petitioner argues the Court must grant the writ.

On post-conviction review, the Mississippi Supreme Court considered Petitioner's three-pronged argument that the use of the robbery aggravator at sentencing was inappropriate, as it was used as both the underlying felony for the capital murder charge and to elevate the sentence to death. *See Brawner II*, 947 So.2d at 264. The court found the claim procedurally barred as it was capable of being raised on direct appeal and was not. *See id.* The court alternatively noted that the use of the underlying felony as an aggravating factor at sentencing has been repeatedly rejected by the court and held the "stacking" argument without merit. *See id.* at 264-65.

Respondents maintain that this claim is procedurally barred. Petitioner argues that the State has inconsistently applied this bar; thus, it is not adequate. In the alternative, Petitioner maintains that cause and prejudice exist, as trial counsel was also appellate counsel and could not have argued his own ineffectiveness on direct appeal. He also argues that failure to consider this

claim would result in a fundamental miscarriage of justice, as he can show that but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under State law.

The Court notes that it does not appear that Petitioner raised this claim in State court as one of ineffective assistance of counsel, and it would ordinarily be barred for Petitioner's failure to present it to the State court. *See Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."). As a claim of ineffective assistance of counsel is a claim of an independent constitutional violation, the claim must be satisfied in state court before habeas relief may be granted on that basis. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, Respondents have not maintained that Petitioner failed to present this as an ineffective assistance of counsel claim; therefore, the Court declines to impose a bar on that basis. Nonetheless, the claim is barred as it was raised before the Mississippi Supreme Court as a substantive claim. The bar relied upon by the Mississippi Supreme Court has been recognized as independent and adequate grounds to bar habeas relief. *See Stokes v. Anderson*, 123 F.3d 858, 860-61 (5th Cir. 1997) (finding the Mississippi Supreme Court regularly and strictly applies the procedural bar in Miss. Code Ann. § 99-39-21(1)). Petitioner has not demonstrated cause and prejudice, or that a fundamental miscarriage of justice will result if the claim is not considered. *See, e.g., Coleman*, 501 U.S. at 750.

Without disturbing the bar, the Court notes that as long as narrowing occurs, "[t]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make

[the] sentence constitutionally infirm." *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988); *see also Evans v. Thigpen*, 809 F.2d 239, 241 (5th Cir. 1987); *Wingo v. Blackburn*, 783 F.2d 1046, 1051 (5th Cir. 1986).[5] Mississippi designates its death-eligible capital defendants by statutory definition, and it narrows at the penalty phase through the use of aggravating circumstances. *See* Miss Code Ann. § 97-3-19(2) and § 99-19-101; *see also Tuilaepa v. California*, 512 U.S. 967, 972 (1994) ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."). Petitioner has not demonstrated an entitlement to relief on this claim. As Petitioner has not demonstrated that he is entitled to relief on the substantive claim, Petitioner cannot demonstrate counsel's ineffectiveness for failing to raise it. This claim shall be dismissed.

**E. Failure to have entire trial record transcribed**

Petitioner argues that his attorney rendered ineffective assistance in failing to have the entire trial transcribed, including voir dire and opening and closing statements. On direct appeal, Petitioner raised a challenge to the prosecutor's use of peremptory challenges against women, yet counsel failed to request that the transcript be prepared for purposes of appeal. Petitioner maintains that counsel rendered ineffective assistance in failing to have the entire record transcribed prior to presenting this known constitutional error to the Mississippi Supreme Court on appeal, particularly given counsel's knowledge that the court would need the voir dire transcript in order to conduct a comparative review. Instead, Petitioner notes, the transcript

---

[5] The Court notes that the jury found three aggravating circumstances with respect to Counts II, III, and IV. (*See* Trial Tr. vol. 6, 478-81).

submitted to the reviewing court specifically notes that defense counsel did not request that the voir dire portion of the proceedings be transcribed.

On post-conviction review, the Mississippi Supreme Court held that Petitioner had, at all times, "been aware that there existed audio tapes and a shorthand record of these missing portions of the transcript." *Brawner II*, 947 So.2d at 262. Petitioner did not claim a specific error to the court, but rather, he argued that post-conviction counsel could not address all possible errors unless he had a full transcript. *See id.* The court found Petitioner's allegation of prejudice conclusory and insufficient to raise a constitutional issue. *See id.* at 262-63. Petitioner now argues that the Mississippi Supreme Court's rejection of his peremptory challenge claim on the merits "is troubling" because counsel for Petitioner did not request the record, and counsel allowed the court to go outside of the record and consider evidence not certified to be correct.

Respondents argue that Petitioner was in possession of the tape recordings of the voir dire, and that a full transcription has been on file with the Mississippi Supreme Court since November 2005. Respondents maintain that the Mississippi Supreme Court had possession of the transcript at the time it made its decision, and that Petitioner's claim is conclusory and cannot support a right to relief. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1994).

The trial transcript filed in this case clearly notes that "VOIR DIRE IS OF RECORD BUT AT REQUEST OF DEFENSE COUNSEL SAME IS NOT A PART OF THIS TRANSCRIPT." (Trial Tr. vol. 3, 105). On direct appeal, Petitioner did raise a claim of gender bias in the State's exercise of its peremptory challenges, and Petitioner cited to the peremptory challenge portion of the transcript to support his claim. (*See* No. 2002-DP-00615-SCT, "Brief of

Appellant" 27-31). Included in the documents that were filed with the Mississippi Supreme Court as part of the direct appeal were juror questionnaires from two prospective jurors who were peremptorily struck by the prosecution. The supplemental volume, which includes the voir dire portions of the transcript, was filed with the Mississippi Supreme Court on November 14, 2005. (*See* Supp. vol 1 of 1).

Indigents have the right to free transcripts on appeal. *Griffin v. Illinois*, 351 U.S. 12, 19 (1956). The Court is not privy to why counsel did not request a full transcript be filed, but it is clear that the Mississippi Supreme Court had the full record when it considered Petitioner's claim on direct appeal. *See*, *e.g*., *Brawner I*, 872 So.2d at 7-12. Petitioner has cited to no other issue under this ground for relief that was inadequately presented, and the Court finds that Petitioner has failed to demonstrate that he is entitled to relief based upon the Mississippi Supreme Court's resolution of this claim.

**F. Ineffective post-conviction process**

After Respondents submitted an answer to the petition filed in this cause, Petitioner filed a traverse stating the instant ground for relief had not been presented to the State courts and requesting this Court to stay his federal habeas petition and hold it in abeyance while he sought to exhaust his claims in State court. (*See* docket entry no.11 at 4). After Respondents responded to the traverse, Petitioner conceded that this ground for relief is procedurally defaulted. Federal habeas counsel stated that the Mississippi Office of Capital Post-Conviction Counsel was preparing to file a successor petition to raise potentially meritorious claims that should have been raised in an amended post-conviction petition to the Mississippi Supreme Court. Petitioner

maintains that his failure to exhaust his claims in State court would not bar this Court's review, as "circumstances exist that render[ed] [the State court corrective] process ineffective to protect" his rights. *See* 28 U.S.C. § 2254(b)(1)(B)(ii).

This Court accepted the traverse but denied Petitioner's request to stay his federal habeas proceedings. (*See* docket entry no.16). In doing so, the Court noted that Petitioner's claim would be barred in State court based on time and successive petition bars. (*See id.* at 4). The Court also noted that "Petitioner has argued that the State corrective process was ineffective to protect his rights, which[,] if proved, would allow federal habeas review of his claim." (*See id.* at 4). The Court found "it would be premature to require dismissal of Petitioner's thirteenth ground for relief without requiring briefing in this cause," and it set a briefing schedule. (*See id.* at 4-5). In the memorandum filed in support of the instant petition, Petitioner did not brief the merits of the claims in this ground. Rather, he states that the Court's reservation of the applicability of § 2254(b)(1)(B)(i) and (ii) allows review of the claim.

In his memorandum, Petitioner notes that this Court did not address whether Petitioner's circumstances meet the standard of 2254(b)(1)(B)(i) and/or (ii). Petitioner notes that on May 19, 2005, the Mississippi Supreme Court ordered that the entire State court record be transcribed, and counsel was given time to prepare an amended post-conviction request. On November 14, 2005, the new transcripts were filed with the Mississippi Supreme Court, but when the Mississippi Supreme Court issued its post-conviction review opinion on October 26, 2006, it specifically noted that counsel never amended the petition. Therefore, Petitioner maintains, circumstances existed that rendered the post-conviction process ineffective to protect his rights,

as counsel was deficient in failing to review the transcripts and prepare and file the amendments.

Respondents argue that this Court's order gave Petitioner the opportunity to show the cause and prejudice necessary to overcome the applicable bars and prove that the State corrective process did not effectively protect his rights, but he failed to brief the claim. Therefore, Respondents argue, this claim is subject to dismissal. In addition, Respondents argue that Petitioner does not meet either of the exceptions that would exempt him from the successive petition and time bars that preclude review of this claim. *See* Miss. Code Ann. § 99-39-27(9) (successive petition bar) and Miss. Code Ann. § 99-39-5(2) (time bar). Moreover, Respondents argue that Petitioner cannot assert the ineffective assistance of post-conviction counsel to show cause.

The attorneys who represented Petitioner at trial also represented him on appeal, and they failed to request that the court reporter transcribe all of the trial proceedings. The omitted portions included pre-voir dire opening statements, voir dire proceedings, opening statements to the empaneled jury, and closing arguments at both stages of trial. *See Branwer II*, 947 So.2d 254, 262 (Miss. 2006) ("Absent from the transcript presented to [the Mississippi Supreme Court] on direct appeal was the word-for-word dialogue of voir dire, opening statements and closing statements during the sentencing phase."). After the additional transcripts were prepared, no one in the State post-conviction office filed a supplemental pleading that addressed the issues revealed in the missing transcripts, and no additional arguments were raised. Petitioner contends, for example, that the following information was available from the transcripts:

a. During pre-voir dire statements, counsel for Petitioner informed the jury that the defense

would be insanity even though he knew that there was no factual basis for the argument, and he again raised the issue of an insanity defense when giving an opening statement to the empaneled jury.

b.  Trial counsel argued at sentencing that life imprisonment would be worse than the death penalty, revealing a lack of mitigation strategy.

c.  Trial counsel conceded Petitioner's guilt.

d.  Trial counsel improperly interjected religion into the trial.

e.  Mr. Defer, who was not a practicing attorney until the day trial commenced, prepared the motions in limine for Petitioner's trial.

f.  Trial counsel failed to offer any mitigation evidence during closing argument.

Petitioner maintains that despite post-conviction counsel's argument to the Mississippi Supreme Court that meaningful appellate review was impossible without the full transcript, counsel failed to present additional issues to the Mississippi Supreme Court.  Additionally, Petitioner argues, the Mississippi Supreme Court failed to address the court rules and statute requiring the submission of the entire transcript to the court in death penalty cases, and instead placed the burden on him.[6]  Petitioner maintains that even if the claim is procedurally defaulted, cause and actual prejudice or a fundamental miscarriage of justice resulting from failure to consider the claim will allow review.

---

[6] Petitioner notes that Rule 10(b)(2) of the Mississippi Rules of Appellate Procedure requires that all portions of the trial proceedings be transcribed for appeal in cases where a death sentence is issued.  Miss.R.App.P. 10(b)(2).  The requirement also exists by statute.  *See* Miss. Code Ann. § 99-19-105(1) (clerk of trial court "shall transmit the entire record and transcript" to the Mississippi Supreme Court in death penalty cases).

The allegations raised in this ground for relief have never been presented to the State court for review and are barred. *See Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (exhaustion requirement "is not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition"). Petitioner's claim cannot now be presented to the State courts for review as he does not meet an exception to the time bar or successive petition bar under the Mississippi Uniform Post-Conviction Collateral Relief Act. *See* Miss. Code Ann. § 99-39-27(9) (excepting from successive petition bar cases in which petitioner can demonstrate an intervening decision "that would have actually adversely affected the outcome of his conviction or sentence" or new evidence not discoverable at trial of a practically conclusive nature that, had it been introduced, would have caused a different result in the conviction or sentence) and Miss. Code Ann. § 99-39-5(2) (a statute of limitations of one year is applicable to filings for post-conviction relief in capital cases, with the exceptions of an intervening decision and previously unavailable evidence). Petitioner's claim does not rely upon an intervening decision in the law, or the discovery of new evidence that was not discoverable at the time of trial. Therefore, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice" to meet the exception of § 2254(b)(1)(B). *Bagwell v. Dretke*, 372 F.3d 748, 755-57 (5th Cir. 2004).

Petitioner's argument is that post-conviction counsel failed to get a full transcript and submit potentially meritorious claims for review. This is insufficient to establish an entitlement to relief. Cause must be an "external force" that impeded counsel's efforts to comply with the

rule. *Id.* at 756. There is no right to counsel in state post-conviction proceedings, thus, there is no right to the effective assistance of post-conviction counsel. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Ruiz v. Quarterman*, 460 F.3d 638 (5th Cir. 2006) ("Yet the law of this Court is clear: ineffective state habeas counsel does not excuse failure to raise claims in state habeas proceedings."); *Robert v. Dretke*, 356 F.3d 632, 640 (5th Cir. 2004). This rule is applicable even where a claim cannot be effectively asserted until state post-conviction proceedings. *See Martinez v. Johnson*, 255 F.3d 229, 239-41 (5th Cir. 2001) (habeas petitioner cannot raise ineffectiveness of post-conviction counsel to avoid any resultant procedural bar). Additionally, Petitioner has also failed to make the requisite showing that he is actually innocent, either of the convicted crimes or of the death penalty. *See, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 339-40, 347 (1992). This claim is barred.

Moreover, the Court notes that even if it were to review Petitioner's allegations on the merits, Petitioner has not presented facts that would establish deficient performance by counsel or resulting prejudice in this conglomerate ineffective assistance of counsel claim. Counsel were significantly limited in their defense of Petitioner by Petitioner's own statements and conduct. Petitioner confessed to the murder of four individuals, including his own child, whom he shot because she could identify him. After the murders, he went home and proposed to his girlfriend, offering to her a wedding set that he had stolen from his ex-mother-in-law's body. He refused to consider any plea deal that would result in a sentence of life imprisonment and stated that he wanted a jury to decide his fate. (*See, e.g.*, Pet. Memo, Ex. 11). He testified before the jury that

he deserved death.  (*See* Trial Tr. vol. 5, 414).  The Court finds this claim barred and otherwise insufficient to provide Petitioner with relief.  This claim shall be dismissed.

## II. *Apprendi* and *Ring*

Petitioner argues that any fact that increases the maximum penalty for a crime, other than a prior conviction, must be charged in the indictment.  He maintains that the grand jury in his case did not set forth the aggravating circumstances in the indictment, and that the Mississippi Supreme Court unreasonably excluded the constitutional principles of *Apprendi* and *Ring* in rejecting this claim.  In *Apprendi v. New Jersey*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 446, 490 (2000); *see also Ring v. Arizona*, 536 U.S. 584, 589 (2002) (applying *Apprendi*'s rule to facts subjecting a defendant to death).

On post-conviction review, the Mississippi Supreme Court held this claim barred for Petitioner's failure to raise it on direct appeal.  *See Brawner II,* 947 So.2d at 264.  In the alternative, the court noted it had "repeatedly dealt with this argument" and found it without merit.  *Id.* at 265.  The court held that the indictment for capital murder put Petitioner on notice of the statutory aggravating factors that would be used against him, and it held that "*Ring* and *Apprendi* have no applicability to Mississippi's capital murder scheme."  *See id.*

The bar relied upon by the Mississippi Supreme Court has been recognized as independent and adequate grounds to bar habeas relief.  *See Stokes v. Anderson*, 123 F.2d 858, 860-61 (5th Cir. 1997).  Petitioner has not demonstrated cause and prejudice for the default, or

that a fundamental miscarriage of justice will result if the claim is not considered. *See, e.g.,*

*Coleman*, 501 U.S. at 750. Even in the absence of a procedural bar, however, Petitioner would

not be entitled to relief on this claim.

Petitioner relies in part upon *Jones v. United States*, 526 U.S. 227 (1999), in which the

Court held that facts authorizing higher penalties must be charged in the indictment and proven

beyond a reasonable doubt. *See Jones*, 526 U.S. at 243 n.6. However, *Jones* was a federal

prosecution case. Petitioner interprets *Jones*, *Apprendi*, and *Ring* to hold that aggravating

circumstances increase the penalty over Mississippi's statutory maximum, thereby requiring that

they be recited in the indictment. Petitioner's logic is sound and the practice urged seems

reasonable. However, no clearly established Supreme Court precedent requires that aggravating

factors be alleged in a state court indictment. *See Branzburg v. Hayes*, 408 U.S. 665, 687-88

n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law

guaranteed to state criminal defendants by the Fourteenth Amendment"). *Apprendi* itself noted

that "the Fifth Amendment right to 'presentment or indictment by a Grand Jury" has never been

incorporated against the states. *Apprendi*, 530 U.S. at 477 n.3. Evidence on the appropriate

aggravating factors under Mississippi law was submitted to the jury, and the jury found the

existence of aggravators beyond a reasonable doubt before the sentence of death was imposed.

Petitioner has not demonstrated an entitlement to relief on this claim, and it shall be dismissed.

### III. Avoiding Arrest Aggravator

During the sentencing portion of Petitioner's trial, the court instructed the jury on each

count as to "whether the capital offense was committed for the purpose of avoiding or preventing

a lawful arrest," and no narrowing instruction or further explanation was given. Petitioner maintains that a reasonable juror could have concluded that the killings necessarily established this circumstance, as every murder eliminates a witness to a crime. Petitioner argues that if the elimination of a witness establishes this aggravator without further proof, then it serves no narrowing purpose. He maintains that if the evidence is sufficient to meet Mississippi's construction of the aggravator, it is overbroad.

States with a capital sentencing scheme must guide jurors' discretion in selecting the appropriate punishment once a defendant is found to be eligible for a death sentence. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 380 (1988). An acceptable method of narrowing is by having the sentencer find the existence of specific aggravating circumstances. *Pulley v. Harris*, 465 U.S. 37, 50 (1984). However, these aggravating circumstances must "provide a 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.'" *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (citation omitted). The consideration of an invalid aggravating factor in a weighing state violates the Eighth Amendment. *See Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992) (citing *Sochor v. Florida*, 504 U.S. 527, 532 (1992)).

The Mississippi Supreme Court held this claim barred for Petitioner's failure to raise it on direct appeal. *Brawner II,* 947 So.2d at 266. In the alternative, the court found that the death penalty statute "narrowly defines to whom the avoiding arrest aggravating factor may be applied." *See id.* The court noted that its decisions "have narrowly construed the application of the avoiding arrest aggravator only to circumstances where the accused purposefully killed the

victim of the underlying felony to avoid or prevent arrest for that felony." *See id.* The court also found that credible evidence supported the jury's finding of the aggravating factor, and that the facts of the case showed Petitioner's efforts to avoid arrest. *See id.* at 266-67.

Petitioner argues that this claim is not barred, as the court's language suggests that it intended to waive the bar and address the merits. This Court finds that the Mississippi Supreme Court expressly found this claim barred and reached the merits of the claim in the alternative. *See Branwer II*, 947 So.2d at 266. The alternative discussion does not vitiate the bar. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). Petitioner has not demonstrated cause and prejudice, or that a fundamental miscarriage of justice would result if this claim were not considered. *See, e.g., Coleman*, 501 U.S. at 750.

As noted by the Mississippi Supreme Court:

Brawner confessed that it was his intent to rob the Crafts and Barbara. For that purpose he purchased and wore rubber gloves and broke into the Crafts' home earlier that day to steal Carl's rifle. He entered the Crafts' home the second time for the sole purpose of robbing the inhabitants. It was not until after he had entered the home that he realized he would not be able to "get away with" the robbery without eliminating the witnesses. Barbara had gunshot wounds to her hands which indicated that she received them in a defensive posture. The only reason he shot his daughter, Paige was because she had witnessed him shoot Jane and Barbara and he feared that she would identify him to the police.

After he shot Jane, Barbara, and Paige, he waited for Carl to come home before shooting him as he walked in the door. Brawner then stole Carl's wallet, Jane's wedding ring, and food stamps from Barbara's purse. Afterwards, he wiped down the crime scene with Windex to eliminate evidence. After taking the money from Carl's wallet he disposed of the wallet so that it could not be found. Later, when confronted by the police he told them that he had bought the ring from a pawn shop.

*Brawner II*, 947 So.2d at 267.

The evidence, as recited by the Mississippi Supreme Court, is sufficient to support the giving of the aggravating circumstance, as there was a wealth of evidence before the jury that Petitioner killed to "cover his tracks." *See, e.g.*, *Manning v. State*, 735 So.2d 323, 350 (Miss. 1999); *Leatherwood v. State*, 435 So.2d 645, 651 (Miss. 1983). Petitioner has not demonstrated that he was entitled to a limiting instruction on the "avoiding arrest" aggravator. *See Gray v. Lucas*, 677 F.2d 1086, 1109-1110 (5th Cir. 1982) (finding Mississippi's construction of this factor "not so broad that it comprehends an impermissibly large group of murderers"). This claim is barred, and Petitioner has not otherwise demonstrated an entitlement to relief on this claim. This claim shall be dismissed.

## IV.  Automatic Capital Crime

Count I of Petitioner's indictment was for the willful murder of his daughter, Candice Paige Brawner, while in the commission of the crime of felonious abuse and/or battery of the child. Petitioner's jury found as an aggravating circumstance that Paige was murdered while Petitioner was engaged in the commission of the crime of felonious abuse and/or battery of a child. Petitioner argues that reading the felonious child abuse statute in conjunction with the capital murder statute results in an automatic capital crime regardless of how the child dies, and that the death penalty statute as applied to felonious child abuse is unconstitutional. In short, he argues that no constitutionally mandated narrowing occurs because the manner of the killing acts as the felony child abuse.

On direct appeal, Petitioner argued that there was no evidence of an underlying felony child abuse, and the evidence showed that either of the two gunshots inflicted on Paige would

have caused her death. *Brawner I*, 872 So.2d 1, 15.  The court noted that under Mississippi law, the "intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder." *See id.* at 16.  The court also noted that the evidence in the record showed that Paige watched as Petitioner shot her grandmother and mother twice before shooting her. *See id.*  Noting that shooting Paige twice was striking the child in a manner as to cause serious bodily harm under Miss. Code Ann. § 97-5-39, the court rejected the claim that it was not capital murder. *See id.*

On post-conviction review, Petitioner argued that the death penalty statute as applied to felonious child abuse is unconstitutional. *See Brawner II*, 947 So.2d at 267-68.  The court found the claim barred for failing to raise it on direct appeal; however, it stated it would "address the merits" as Petitioner was raising a challenge to the constitutionality of the State's capital murder scheme. *See id.* at 268.  The Court noted that in *Stevens v. State*, 806 So.2d 1031, 1044 (Miss. 2001), it found that the legislature intended that the intentional murder of a child would constitute felonious abuse of the child under the capital murder statute. *See id.* at 268.  Noting that in *Farga v. State*, 514 So.2d 295 (Miss. 1987), it rejected an identical argument, the court found that the statutes read in conjunction were constitutional.

The felonious child abuse statute reads that "[a]ny person who shall intentionally . . . except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child. . .". *See* Miss. Code Ann. § 97-5-39(2)(a).  When a person is engaged in the attempt or commission of felonious abuse/and or battery of a child and the child's death

results, the individual may be charged with capital murder. *See* Miss. Code Ann. § 97-3-19(2)(f).

Petitioner's argument is essentially that one act cannot constitute a felony and elevate his case to capital murder. In *Farga*, the court held that the capital murder statute and felonious child abuse statute serve different societal interests, as the child abuse statute is designed to protect the child while the capital murder statute is designed to punish and deter such crimes in the event that death results. *See Farga*, 514 So.2d at 303. In *Stevens v. State*, the court held that the felony child abuse that happens to result in the child's death does not merge into the murder itself and could serve as a statutory basis for a charge of capital murder. *See Stevens*, 806 So.2d at 1044. To be valid, an aggravating circumstance cannot apply to every defendant convicted of murder and must apply only to a subclass of defendants convicted of murder. *Tuilapea*, 512 U.S. at 972. In this case, the aggravating circumstance applies only to the subset of murderers who commit their crime while engaged in the abuse or battery of a child. As the Court noted earlier, the aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *See id.* Petitioner has not demonstrated that the Mississippi Supreme Court's resolution of this issue is objectively unreasonable, and he is not entitled to relief on this claim.

### V. The Denial of Counsel's Challenges to the State's Peremptory Challenges

Petitioner maintains that the prosecution used their peremptory challenges in a gender biased manner during his trial, and that the trial court erred in finding no pattern of discrimination in the challenges. During the exercise of peremptory challenges, the State used eight out of ten strikes to exclude women from the jury. Petitioner argues that the trial court

erred when it found there was no discrimination because women sat on the jury, and that the purported gender neutral explanations offered by the State do not pass constitutional muster.

Petitioner also argues that the purported reasons offered by the State were pretextual, and he notes that the State relied on matters outside the record with regard to two prospective jurors. Petitioner argues that the Mississippi Supreme Court erred by finding that no prima facie case of discrimination had been made, as the State gave its purported reasons for the strikes. He argues that the Mississippi Supreme Court's treatment was contrary to and an unreasonable application of clearly established law, as the trial court should have been required to inquire into whether there had been purposeful discrimination.

The Mississippi Supreme Court determined that the analysis in *Batson v. Kentucky*, 476 U.S. 79 (1986) was applicable to Petitioner's claim of gender discrimination in jury selection. *See Brawner I*, 872 So.2d at 7-8. Applying the *Batson* analysis to a gender context, the court set forth the three-step analysis to be used. *See id.* at 9-10. First, the party alleging discrimination must make a prima facie showing that the proponent of the strike exercised peremptory challenges on the basis of gender. *See id.* at 10. If that showing is made, then the party exercising the challenge is required to give a gender-neutral explanation for the strike. *See id.* at 9-10. Finally, after hearing the gender-neutral reasons and any rebuttal to those reasons, the trial judge makes a factual determination of whether the reasons proffered for the exercise of the strike are, in fact, neutral. *See id.* at 9. The court determined that "the pivotal question" in determining whether a prima facie case has been made is determining whether the opponent of the strike has shown that the party exercising the strikes has engaged in a pattern of strikes based

on gender. *See id.* at 10. Here, the court noted, the trial court found on two separate occasions that Petitioner did not make out a prima facie showing of discrimination. *See id.* at 10. The Mississippi Supreme Court noted that out of the thirty-six prospective jurors in the pool, at least twenty-two of them, or more than sixty percent, were female. *See id.* The court found that "[a]lthough the State struck substantially more women than men, the fact that the selected jury incorporated a proportionally larger percentage of women than were in the venire contradicts the claim of gender discrimination." *See id.* The court also noted that the record contained the State's comment that a disproportionate amount of females were on the jury venire, and it noted that, at one point in the peremptory challenge process, thirteen out of fifteen jurors in a row were female. *See id.* at 9. The empaneled jury was composed of nine women and three men. *See id.* at 7.

The Mississippi Supreme Court noted with approval that the trial judge allowed the State to make an offer of gender-neutral explanations even in the absence of a prima facie showing. *See id.* at 10-11. The court found that this practice helps reviewing courts in addressing challenges later raised to jury selection processes, but that it does not relieve a defendant of his burden of making a prima facie case. *See id.* at 11. The court specifically noted that in *Hernandez v. New York*, 500 U.S. 352 (1991) the State offered neutral reasons for its exercise of peremptory challenges without the trial judge first finding that a prima facie case had been made. *See id.* at 11 n.1 (citing *Hernandez*, 500 U.S. at 359). The court determined that the State's voluntary action did not relieve Petitioner of his obligation to make out a prima facie case. *See*

*id.* at 11.[7]  The court found Petitioner had failed to make a prima facie case of gender discrimination and rejected the claim.  *See id.*

The Fourteenth Amendment prohibits the exclusion of potential jurors based solely on gender.  *J.E.B. v. Alabama*, 511 U.S. 127, 146 (1994).  To establish a prima facie case of discriminatory striking, a defendant must produce evidence sufficient to "give rise to an inference of discriminatory purpose."  *Johnson v. California*, 545 U.S. 162, 168 (2005).  At trial, the prosecutor, Mrs. Brewer, used four peremptory strikes in tendering the first twelve jurors for the State, and three of those were against females.  (*See* Trial Tr. vol. 3, 131-32).  Mr. Walker objected on the grounds of *J.E.B. v. Alabama* and argued that as seventy-five percent of the State's initial strikes were against females, he had made out a prima facie case of gender bias.  (Trial Tr. vol. 3, 132).  The trial court found that the State had accepted sen females, and that there had been no showing of gender bias.  (*See id.* at 133).  Mrs. Brewer offered to make a proffer of race-neutral reasons, and the trial court stated that she could if she felt "more comfortable doing so."  (*See id.* at 133).  Mrs. Brewer argued that Christina Boyd, Juror no. 38, was struck because she was pregnant.  Charity Powers, Juror no. 68, stated in voir dire that "four deaths were enough," she knew Mr. Walker, and she gave voir dire responses that she was hard-headed.  (*See id.*).  The State purported to strike Linda Jackson, Juror no. 108, because she had a brother who was convicted of murder for killing two family members.  (*See id.* at 133-34).

Mr. Walker argued that there was no evidence that the pregnant juror was going to go into

---

[7]  The court also addressed the use of information outside of the record to support a strike, and it stated that courts should exercise caution to ensure such information is credible and supported by on-the-record findings on the issue.  *See id.* at 12.

labor soon, and Mrs. Brewer responded that there had been recent problems with a pregnant juror due to issues with the air conditioning in the courthouse.  (*See id.* at 134).  The trial court noted that the prosecution did not have to accept family members of people it had prosecuted, and it found that it could not find gender bias based on the fact that the prosecutor did not want to accept a pregnant juror. (*See id.* at 134-35).  After defense counsel exercised its first round of peremptory strikes, Mrs. Brewer objected on the basis that Mr. Walker had struck every single white male that had been tendered.  (*See id.* at 138).  After Mr. Walker offered his gender-neutral reasons for the strikes, the court found no bias in defense counsel's exercise of strikes.  (*See id.* at 140).  Following the State's second round of peremptory challenges, Mr. Walker again objected that the State had been gender biased in its use of five out of six challenges to strike females from the jury.  (*See* Trial Tr. vol. 3, 141).  The State countered that it had accepted five females, and that it could not " help it if there's all females in the line."  (*See id.* at 142).  The trial court found that "[i]t's certainly not a prima facie showing."  (*See id.* at 142).  Mrs. Brewer again, however, gave explanations for the strikes.  (*See id.*).  Mrs. Brewer stated that Velma Medley, Juror no. 120, was struck because she stated that she thought life imprisonment was worse than death.  (*See id.*).  Mr. Walker conceded that the State had a valid reason to strike Ms. Medley.  (*See id.*).  Lynn Massey, Juror no. 122, was struck because the State gathered some information about her from law enforcement officials that led them to believe she would not be a good juror in a death penalty case.  (*See id.* at 142-43).  Similar reasons were given for striking Juror no. 169, Rotonya Nelson.  (*See id.* at 143).  The State purportedly struck Glenda Howard, Juror no. 176, because she  listed no employment on her juror questionnaire and indicated that the trial

would be a hardship for her if she was selected. (*See id.* at 143). Juror No. 193, Sherry Ann Moore, was struck because the State preferred the juror next to her, Juror 209, also a female. (*See id.* at 143-44). In rebuttal, Mr. Walker argued that the State was being inconsistent because Linda Jackson was unemployed and the State did not strike her on that basis. (*See id.* at 144). The State responded that they struck her because they prosecuted her brother for two counts of murder. (*See id.*). Mr. Walker also argued that the State was going outside of the record and presenting hearsay evidence for its strikes. (*See id.* at 144-45). The court found no pattern of discrimination in the State's selection process. (*See id.* at 146).

The record is clear that the trial judge did not find that Petitioner had made out a prima facie case of discrimination. Approximately sixty percent of the jury pool was female, and seven of the first twelve jurors tendered to defense counsel were female. The fact that the trial court allowed a record to be made does not negate the fact that the court found Petitioner had not made out a prima facie case of discrimination. Moreover "all relevant circumstances" do not point to that conclusion. *See Batson*, 476 U.S. at 96. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court was objectively unreasonable, and he is not entitled to relief on this claim.

## Certificate of Appealability

Under the AEDPA, a petitioner must obtain a certificate of appealability ("COA") before he can appeal this Court's decision. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would

find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must also demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. A district court may deny a COA without requiring further briefing. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner has not demonstrated that reasonable jurists would debate its procedural or substantive rulings on the claims raised by Petitioner. Therefore, a certificate of appealability will not issue from this decision.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that the denial of his State petition was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings. Accordingly, the Court **DENIES** federal habeas relief, and the instant petition shall be dismissed with prejudice and a COA denied. All pending motions are dismissed as moot. A separate order in accordance with this opinion shall issue today.

**THIS** the 27th day of January, 2010.

**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**